UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

100 EMERALD BEACH WAY LC,

    Plaintiff,

v.                                        **DEMAND FOR JURY TRIAL**

TOWN OF PALM BEACH,

    Defendant.

_____/

## COMPLAINT

Pursuant to 42 U.S.C. § 1983, Plaintiff 100 Emerald Beach Way LC[1] brings this action against Defendant Town of Palm Beach for engaging in a continuing and systematic pattern of discriminatory practices, unequal treatment, and actions that have violated Plaintiff's rights under the Fourteenth Amendment of the United States Constitution.

## PRELIMINARY STATEMENT

1.    The Fourteenth Amendment to the United States Constitution guarantees every citizen the right to equal protection under the laws.  This means, in common parlance, that governmental entities must treat similarly-situated people alike.  The right of American citizens to be free from intentional discrimination and disparate treatment at the hands of government officials is a fundamental bulwark against government overreach.

2.    For nearly a year now, the Town of Palm Beach has obliterated these fundamental rights by colluding with two influential and well-connected Palm Beach residents—John and

---

[1] Plaintiff's sole member is, and has always been, Lamia Jacobs, a full-time Connecticut resident.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Citigroup Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

Margaret Thornton—to wield the force and power of government to perpetrate an unrelenting campaign of discrimination and harassment against Plaintiff. The Town has colluded with the Thorntons to take actions against Plaintiff that it has not taken against similarly-situated people. At the behest and under the direction of the Thorntons, the Town has singled out Plaintiff for disparate treatment without any rational basis and has flagrantly violated Plaintiff's fundamental right to due process in a number of proceedings.

3.     The evidence establishing the Town's discrimination against, and unequal treatment of, Plaintiff is overwhelming, as reflected by contemporaneous emails, transcripts of public hearings, and other materials obtained from publicly-available sources and Freedom of Information Act requests. Some of the Town's more egregious examples of discriminatory practices include:

a. Colluding with the Thorntons to initiate a code enforcement proceeding against Plaintiff to compel the removal of a 65-year-old load-bearing wall that the Town had already inspected and approved *on no less than 8 separate occasions* over the past 15 years, including when Plaintiff constructed a new section of the same wall.

b. Colluding with the Thorntons by providing them with the code enforcement letter regarding the removal of the wall, and permitting them to revise the letter, *before the Town even issued it.*

c. Colluding with the Thorntons by signing a declaration under oath—*that the Thorntons actually drafted*—to bolster the wall-related code enforcement charge and permitting the Thorntons to use the declaration in private litigation against Plaintiff. When confronted with these facts at the public hearing concerning the wall, Paul Castro, the Town's Zoning Administrator, had to admit under oath that he "did not write that letter," he "was unaware" of the declaration, and "would never sign something like that."

d. Colluding with the Thorntons by permitting Margaret Thornton and her attorney to appear at a public hearing to argue an *ex parte* motion to reconsider a Town decision regarding the wall, even though (i) no item regarding the Thorntons or Plaintiff was on the agenda, and (ii) Plaintiff was not provided with any notice that the Thorntons were going to appear and make this *ex parte* argument. The Town's outside counsel, John "Skip" Randolph, admitted that he was told "the night before" that the Thorntons planned to appear at the hearing and argue the *ex parte* motion to reconsider, yet neither he nor

2

anyone from the Town advised Plaintiff, even though Plaintiff's property rights were at stake. The transcript of the *ex parte* hearing plainly reflects that the Chair of the Board, Matthew Natale, was also tipped off, because he slipped and informed the rest of the Board that Margaret Thornton was there "to ask for a motion to reconsider" before she or her counsel announced why they were there or what they planned to argue.

e.  Failing to adhere to the Town's own requirement requiring Board members to disclose *ex parte* communications of the sort described above.[2]

f.  Margaret Thornton and her counsel then proceeded to knowingly deceive the rest of the Board at the *ex parte* hearing by claiming that Margaret Thornton and her counsel were not present for the entirety of the hearing the month before. The Town's counsel (Skip Randolph)—who *was* present the month before and knows that Margaret Thornton was also present the month before—summarized the basis for the *ex parte* motion to the Board as follows: "The allegation of Margaret Thornton is, and of her attorney, is that they were prejudiced because they were out of the room, when this matter was heard and did not have an opportunity to address the merits and the merits related to the fact that this was under consideration by the court and that you should act on this until the court has acted."

g.  Chair Natale then advocated for Margaret Thornton's *ex parte* motion for reconsideration—which again was *not* on the agenda and *not* noticed for hearing and as to which Plaintiff had *no* notice and thus did *not* appear. Chair Natale said: "it would be best to hear [the motion] now" and it is "fair enough." The Board allowed the *ex parte* motion to proceed to a vote, and two Board members, *including Chair Natale*, voted in favor of it. Plaintiff did not learn of the *ex parte* hearing until Plaintiff's counsel was served with the Board's Order four days later.

h.  Colluding with the Thorntons by initiating a second code enforcement proceeding against Plaintiff to compel the removal of a shed that has existed for decades and that the Town had never challenged.

i.  Colluding with the Thorntons by approving their request to construct a tennis court complex and a parking facility on the lot adjacent to Plaintiff's home without requiring them to first obtain the special exceptions required under the Town's Code, even though the tennis court complex comprises the entirety of the lot and includes one fully-constructed tennis court, a referee chair, a lounge tennis canopy area, a grass area

---

[2] Under Florida law, a ***presumption*** of prejudice arises when a quasi-judicial officer receives an *ex-parte* contact. However, a county or municipality may adopt an ordinance removing the presumption by establishing a process to disclose *ex-parte* communications or by adopting an alternative process for such disclosure. The Town has not adopted such an ordinance, but instead follows the "alternative process" of calling for *ex-parte* contact prior to calling up items for hearing. In this case, however, the Town cannot overcome the ***presumption*** of prejudice because it did not call for *ex-parte* contact prior to hearing the *ex parte* motion to reconsider.

intended for a second tennis court (but now housing a soccer goal post) and a 10-car supplemental parking lot for trucks and other vehicles that service the Thorntons' estate next door.

j. Not notifying Plaintiff of its decision not to require the special exceptions, thereby affecting Plaintiff's right to an appeal, and then voting that Plaintiff's appeal was untimely when the Zoning Administrator finally issued a written, appealable decision.

k. Having a Town Council member—Bobbie Lindsay—not recuse herself during these administrative appeal proceedings, and drive the discussion at the proceedings, even though the Thorntons' attorney (Timothy Hanlon) is Ms. Lindsay's father's law partner and works at a firm bearing his, and her, name (Alley, Mass, Rogers & Lindsay PA).

l. Not calling for the disclosure of *ex-parte* communications during these administrative appeal proceedings, either, even though every other item on the Town Council agenda that day required the disclosure of *ex-parte* communications.

m. Shockingly, the day after this administrative appeal hearing, the Thorntons' attorney (Ms. Lindsay's father's partner, and the same attorney that argued at the *ex parte* hearing) wrote to the Town's attorney and asked to amend the Town's Code *in order to render Plaintiff's second appeal moot*.[3]

n. Colluding with the Thorntons by refusing—even after Plaintiff prevailed in a petition for certiorari in the Circuit Court, which invalidated the approvals for the Thorntons' tennis court complex and supplemental parking facility—to initiate a code enforcement proceeding against the Thorntons and continuing to allow their unlawful structures to remain (while at the same time wrongfully ordering Plaintiff to remove its load-bearing wall and shed).

o. Colluding with the Thorntons by seeking to have Plaintiff's lawsuit seeking the removal of the *unpermitted* tennis court complex and parking facility stayed, while allowing the Thorntons to seek after-the-fact permits.

p. Colluding with the Thorntons to allow them to proceed under the same application for the after-the-fact approval of the tennis complex and parking facility that the Circuit Court had previously voided, even though the Town's Code expressly requires the Thorntons to file a new application under the laws then existing and *even though the Town had previously stated on four separate occasions—in writing—that a new application would be required*.  This sudden change in position by the Town, after four contemporaneous writings to the contrary, was crucial for the Thorntons, because the *unpermitted* tennis court complex and parking facility that they had already built does not conform to the setback requirements currently existing in the Town's Code.  In other words, if the Town had not reversed its position, the Thorntons would have had to demolish the tennis court complex and parking facility that they had already built.

---

[3] This is one of many documents obtained through Freedom of Information Act requests.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Citigroup Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

q. Clearing the path for the Thorntons to obtain an after-the-fact permit for their tennis court complex and parking facility by wiping out the Thorntons' code violations—behind closed doors—for 12 illegal "no parking" signs on the Cul-De-Sac.[4]

r. Misrepresenting to Plaintiff on April 24, 2019 that the hearing on the Thorntons' code violations for their 12 illegal "no parking" signs was going forward on May 16, 2019 as previously scheduled, even though the Town had *already* permitted the Thorntons to yet again circumvent the approval process and even though the Town had *already* approved the illegal signs on April 17, 2019.  In other words, the Town concealed from Plaintiff that it had already approved the signs in what seems to be an effort to thwart Plaintiff's potential appeal of this decision.[5]

s. Dismissing Plaintiff's complaint against the Thorntons for 13 illegal "no parking" stamps on the Cul-De-Sac by taking the position that the stamps have been removed, even though a simple inspection demonstrates that the letters are still there (except that they are now black instead of white).

t. While simultaneously refusing to order the Thorntons to remove the 12 illegal "no parking" signs and 13 illegal "no parking" stamps on the Cul-De-Sac, colluding with the Thorntons to harass Plaintiff by *ticketing* Plaintiff's vendors on the Cul-De-Sac, thereby unequally enforcing the Town Code provisions.  Indeed, for years, the Town had actually issued parking permits to Plaintiff's vendors to park on the Cul-De-Sac, and even previously took the position, in an email to the Thorntons, that: "If you feel that there should be no parking on the ingress/egress easement, it is not for the Town to enforce.  It is a civil matter between your client and the other neighbors."

u. Refusing to order the Thorntons to remove the unquestionably illegal tennis "hitting wall" they constructed without the required special exception approvals.  In fact, they agreed with the Thorntons to instead call the hitting wall a basketball/service area.

_____

[4] Under the Town's Code, a building permit cannot be issued if the property owner has outstanding code enforcement violations, so if the Thorntons' code enforcement violations remained outstanding, they could not obtain the after-the-fact building permits.  It is no coincidence that Plaintiff was finally told about this the day before the final hearing regarding approvals for the tennis court.

[5] The Town has a thirty-day deadline to appeal its written decisions.  Plaintiff's online research indicates that the "approval" was granted in an email exchange dated April 17, 2019.  Curiously, the Town has failed to produce this email exchange to the Plaintiff, even though it is responsive to Plaintiff's FOIA Request #TC-107-2019.

4.      As set forth in detail below, the foregoing list is by no means exhaustive.  The discriminatory conduct and disparate treatment to which Plaintiff has been subjected by the Town is even more extensive, and utterly without a rational basis.

5.      The Town's conduct against Plaintiff is, quite simply, morally deplorable and patently illegal.  Government bodies are not permitted to collude with private citizens to target other private citizens.  Nor are government bodies permitted to arbitrarily enforce the laws under which it operates for the benefit of one citizen and to the detriment of another.  As a result, the imposition of punitive damages is warranted to discourage the Town from engaging in such reprehensible conduct in the future.

## PARTIES, JURISDICTION AND VENUE

10.     Plaintiff, 100 Emerald, is a Florida limited liability company that owns property in Palm Beach, Florida.

11.     The Town of Palm Beach is a municipal corporation of the State of Florida.

12.     This suit is brought pursuant to 42 U.S.C. § 1983, which states:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

13.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and has jurisdiction to redress the deprivation under color of state law of any right, privilege or immunity secured by the Constitution pursuant to 28 U.S.C. § 1343(3).

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Citigroup Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

14.     This Court is authorized to award damages for the violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983 and to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

15.     Venue is proper in the Southern District of Florida, West Palm Beach Division, because the real property at issue is located in this district and because the Town's misconduct occurred in this district and geographical area.

## GENERAL ALLEGATIONS

**A.     The Thorntons—Plaintiff's "Similarly Situated" Neighbor**

16.     On May 15, 2002, Plaintiff purchased the real property located at 100 Emerald Beach Way, in Palm Beach, Florida (the "100 Emerald Home").

17.     The 100 Emerald Home is located in a small subdivision comprising three parcels: (A) the 100 Emerald Home; (B) a home located at 1230 South Ocean Boulevard; and (C) a middle lot, delineated in the subdivision as Lot 2, which has a physical address of 200 Emerald Beach Way ("Lot 2"). An aerial photograph is attached as **Exhibit 1**.

18.     On April 17, 2008, John Thornton and Margaret Thornton (the "Thorntons") purchased the middle lot—Lot 2. The Thorntons already owned the 6-acre, oceanfront parcel to the immediate South of Lot 2, located at 1236 South Ocean Boulevard, Palm Beach, Florida ("1236 South Ocean"). The Thorntons purchased Lot 2 to demolish the home that was located there and build a tennis court complex for their children and a 10-car parking facility to act as a supplemental parking lot for their estate next door.

19.     On December 28, 2016, the Thorntons and the Town entered into a Unity of Title Agreement that unified title of Lot 2 with 1236 South Ocean.

20.     Because Plaintiff is "locked" behind the other two parcels in the subdivision, there is a street running along the North end (Emerald Beach Way) that contains a cul-de-sac (the "Cul-De-Sac") in front of the 100 Emerald Home.  Plaintiff has a written ingress and egress easement over Emerald Beach Way to access the 100 Emerald Home.  *See* **Exhibit 2**.

21.     The 100 Emerald Home, Lot 2, and 1230 South Ocean Boulevard are all located in the R-AA, Large Estate Residential zoning district and an area designated as Single-Family under the Town's Comprehensive Plan.  The Thorntons' home, located at 1236 South Ocean Boulevard, is also located in the R-AA, Large Estate Residential zoning district, which is also designated as Single-Family under the Town's Comprehensive Plan.

22.     Plaintiff and the Thorntons are, therefore, similarly situated: they both own properties in the same zoning district in the Town's Comprehensive Plan and are both subject to the same provisions of the Town of Palm Beach Code of Ordinances (the "Town Code" or "Code").

**B.     The Town and the Thorntons Collude to Harm Plaintiff**

23.     In 2014, the Thorntons sued Plaintiff; several years later they abruptly dismissed their suit without prejudice and shortly thereafter sent a demand letter attempting to reserve all of the rights and claims contained in the dismissed suit.  Accordingly, in 2017, Plaintiff sued the Thorntons seeking declaratory judgment.

24.     In that lawsuit, Plaintiff also sued the Thorntons to defend and enforce its express, implied and secondary easement rights over Emerald Beach Way and to pursue a nuisance claim against the Thorntons.

25.     The Thorntons have asserted a number of disingenuous, time-barred claims in response, including claiming that a load-bearing concrete retaining wall located along the side of

Plaintiff's property that has been there for 65 years: (i) is several inches "too high" (even though the Town has inspected the wall at least *eight times* and never previously concluded that it was "too high"); (ii) encroaches on a beach access easement (which easement the Thorntons do not need because they access the beach through their own beach-front mansion); and (iii) was built without a permit (which allegation is belied by the Town's records and, again, was never before raised by the Town even though it inspected the wall *eight times*).

26.     Discovery in these cases, and other information obtained through publicly-available sources, has revealed that the Thorntons and the Town have colluded to treat Plaintiff in a discriminatory manner for the Thorntons' benefit and to Plaintiff's detriment.

**C.     The Town's Unlawful Discrimination against Plaintiff**

27.     The Town has engaged in a continuous pattern of unlawful discrimination against Plaintiff by its disparate application of the Town Code against Plaintiff as compared to the Thorntons—Plaintiff's similarly-situated neighbor.   The Town has pursued this campaign of discrimination against Plaintiff to benefit the Thorntons.

28.     For example, the Town has assessed multiple Code violations against Plaintiff in an arbitrary and irrational manner, at the behest and under the direction of the Thorntons.

29.     The Town allowed the Thorntons' counsel to preview, *and revise*, a code enforcement letter that was then signed by a Town official and used by the Town to prosecute a code enforcement violation against Plaintiff.   The Thorntons' counsel also drafted a Declaration that was signed by the same Town official and used in the same proceeding.

30.     The day after a hearing before the Town Council, in which the Thorntons tried for a *second* time to obtain approval of the tennis court complex and 10-car supplemental parking facility (Plaintiff's appeal of the first approval was successful, resulting in the first approval being

quashed), the Thorntons' counsel wrote to the long-time Town attorney, John "Skip" Randolph,

and the Town's Zoning Administrator, Paul Castro, asking that the Code be amended in order to

render Plaintiff's inevitable second appeal moot.  The email speaks for itself:

> **From:** Tim Hanlon <tim.hanlon@amrl.com>
> **Sent:** Wednesday, March 20, 2019 9:06 AM
> **To:** Paul Castro;John "Skip" Randolph
> **Subject:** 1236 S Ocean
>
> Good morning gentlemen. Thanks for all of your hard work on this matter
> and again apologies that you two and the Town are in the middle of this
> dispute.
>
> On my drive to the Keys last night and this morning, I thought to check
> with you to see if you would consider starting the process to revise and
> amend 134-1759 to remove the setback language mistakenly inserted by
> Logan?
>
> That would render moot the anticipated appeal on the setback issue.
>
> The Thorntons will likely revise the parking plan for the property to fully
> comply with the concept of required parking and avoid the concept of
> supplemental parking in an effort to also render that issue moot.
>
> Thanks again. I will be out of the office the rest of the week but wanted to
> follow up as soon as possible to try and avoid more costly appeals for the
> Town.
>
> What are your thoughts?
> Thanks, Tim

31.    One of the members of the Town Council, Bobbie Lindsay, is connected with the

Thorntons' lawyer, as her father is his law partner.  That relationship, standing alone, may not be

patently inappropriate, provided that she make the appropriate disclosures and recuse herself from

voting.  When the Thorntons' tennis court complex and supplemental parking facility were before

the Town Council the first time, Ms. Lindsay did indeed recuse herself, albeit not based on the fact

that her father and the Thorntons' lawyer were law partners.  Instead, Ms. Lindsay disclosed that

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Citigroup Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

she saw another partner of her father's firm, who also represented the Thorntons' before the Town Council, and that they spoke about the tennis court and parking facility that was going to be considered by the Town Council.

32.     In other words, Ms. Lindsay recused herself at the first approval hearing because she had an *ex parte* conversation with the Thorntons' counsel about the matter being heard by the Town Council. Ms. Lindsay did not disclose the substance of the conversation. She merely recused herself. A copy of the transcript of that hearing, dated August 9, 2017, is attached as **Exhibit 3**. The relevant portions are highlighted.

33.     After Plaintiff appealed that approval to the Circuit Court ***and prevailed***, the Thorntons re-applied and re-appeared before the Town Council for a second time. Ms. Lindsay inexplicably did ***not*** recuse herself the second time around, nor did she disclose the conversation she had with the Thorntons' attorney (who, again, is her father's law partner).

34.     Even worse, Ms. Lindsay was the most proactive member of the Town Council the second time around and helped to drive the conversation towards approval of the Thorntons' tennis court complex and 10-car parking facility ***that had already been rejected by the Circuit Court***. A copy of the transcript of the second hearing, dated March 19, 2019, is attached as **Exhibit 4**. The relevant portions are highlighted.

35.     A month after a public hearing regarding the removal of a 65-year-old load bearing wall, the Thorntons' attorney (Timothy Hanlon, from Ms. Lindsay's father's law firm) apparently called the Town's attorney (John "Skip" Randolph) to tell him that he and Margaret Thornton planned to appear at a hearing the next day to argue a motion for reconsideration. Plaintiff was not on the agenda, nor were the Thorntons on the agenda. Margaret Thornton and her counsel just

walked into a public hearing and began arguing an *ex parte* motion to reconsider a matter that had been heard a month earlier.

36.     Even though the Town's attorney (John "Skip" Randolph) was told in advance that they were going to do this, Plaintiff was ***not*** provided with any notice and was therefore not present to defend itself against the *ex parte* motion for reconsideration that Margaret Thornton and Timothy Hanlon were arguing.  As is clearly demonstrated from the transcript of the hearing, the Chair of the Board (Matthew Natale) was also aware *in advance* that Margaret Thornton was going to appear and argue an *ex parte* motion for reconsideration.  *See* **Exhibit 5**.

37.     When Plaintiff's counsel confronted Skip Randolph about this, his answer was that the motion for reconsideration was denied, so there was no prejudice.  This was a shocking violation of Plaintiff's due process rights.  The Town of Palm Beach is constitutionally precluded from using its powers to intentionally discriminate against its residents.  These events demonstrate a clear pattern of violating Plaintiff's constitutional rights by applying the laws and Code against Plaintiff in a discriminatory manner, in favor and for the benefit of the Thorntons.

38.     Additional egregious examples of the Town's discriminatory conduct against Plaintiff are set forth below.

### i.     *The Town Orders Plaintiff to Remove a 65-Year-Old Load Bearing Wall*

39.     For the past 65 years, a load-bearing wall has been located on the North side of the 100 Emerald Home.

40.     The Town has inspected this wall on a number of occasions and has never taken any action to remove the wall for more than half a century.

41.     In 2004, Plaintiff extended the length of this exact wall.  Plaintiff submitted plans for the wall, which were approved by the Town.  The Town inspected the wall ***on no less than 8***

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Citigroup Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

***occasions***.  The Town never advised Plaintiff that the wall was supposedly built without a permit.
No code enforcement proceeding was ever initiated.

      42.     But after the Thorntons orchestrated the Town's intervention, the Town—under the
guise of using its code enforcement powers—initiated a code enforcement proceeding against
Plaintiff.

      43.     Before the Town initiated the proceeding, it sent the draft violation letter to the
Thorntons' attorney (Timothy Hanlon, the same attorney whose partner is Ms. Lindsay's law
partner) to approve in advance.  The Thorntons' attorney revised it and sent it back:



**TOWN OF PALM BEACH**
Planning, Zoning & Building Department

December 13, 2018

Tim Hanlon

Subject: ~~1236 S. Ocean Blvd.~~ *100 Emerald Beach Way*

Mr. Hanlon:

I searched the Town's records for 100 Emerald Beach Way and found no record of a permit for the
portion of the ~~wall~~ *concrete retaining* within the five-foot beach access easement in the north west corner of ~~the lot.~~ *100 Emerald Beach Way.*

Regards,

*Logan Elliott*

Logan Elliott
Zoning Technician

cc:    John Randolph
       Bill Bucklew, Building Official

*See* **Composite Exhibit 6**.

44.     The Thorntons' attorney also drafted a declaration for the Town to sign, and even told him that "the litigators" had asked for it:

> From: Tim Hanlon <tim.hanlon@amrl.com>
> Sent: Thursday, December 13, 2018 3:00 PM
> To: Logan Elliott <LElliott@TownofPalmBeach.com>; John (Skip) C. Randolph <JRandolph@jonesfoster.com>; Joshua Martin <jmartin@TownOfPalmBeach.com>; Bill Bucklew <BBucklew@TownofPalmBeach.com>
> Subject: Records Search Letter
>
> Logan, Skip, Josh and Bill:
>
> Thanks for the letter.  See attached for three small revisions requested for clarification that are submitted for your collective review and comments.
>
> The litigators are also requesting that Logan sign the attached Declaration to allow the letter to be submitted for evidentiary purposes and to avoid the need for a deposition.
>
> Please let me know if you have any questions regarding the small clarifications to the letter and the Declaration.
>
> Thanks, Tim
>
> M. Timothy Hanlon
> Alley, Maass, Rogers & Lindsay P.A.
> 340 Royal Poinciana Way, Suite 321
> Palm Beach, Florida 33480
> Phone: (561) 659-1770
> Fax: (561) 833-2261
> Direct Fax: (561) 804-4617
> tim.hanlon@amrl.com

*See* **Composite Exhibit 6**.

45.     The Town (through Mr.  Elliott) immediately signed the letter (revised by the Thorntons' attorney) and the declaration (prepared by the Thorntons' attorney).  Copies of the entire email exchange are attached as **Composite Exhibit 6**.

46.     The Town then used the letter and the declaration to initiate a code enforcement proceeding against Plaintiff commanding the removal of the wall that had been in existence for 65 years and that had been inspected by the Town on multiple occasions.  The Thorntons used the letter and the declaration in the litigation with Plaintiff.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Citigroup Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

47.     Remarkably, at the code enforcement hearing before the Town, Paul Castro, the Zoning Administrator, testified that, although he could not find the actual permit going back 65 years, "it's not uncommon … not to find a permit because our records going back that far, over 60 years ago, are sketchy and incomplete in certain situations." (Hr'g Tr. 6:3-6, Mar. 21, 2019).  A copy of the transcript of this hearing, dated March 21, 2019, is attached as **Exhibit 7**.

48.     When asked the direct question—"can you swear today that there was no permit for that wall"—Mr. Castro testified: "Absolutely not."  (**Exhibit 7**, 82:23).

49.     As for the letter and the declaration, Mr. Castro's testimony is nothing short of stunning:

> And for the record, I did not write that letter from the town.
>
> ***
>
> I did not see that document.  I'm Logan's supervisor.  I was unaware that he was going to sign such an affidavit, and I certainly would never sign something like that.

(**Exhibit 7**, 5:15-16, 38:16-19).

50.     Despite the foregoing testimony, the Town nevertheless ordered the removal of the 65-year-old load-bearing wall.  This decision lacked any evidentiary support and was arbitrary and irrational on its face.  And as is demonstrated by the contemporaneous email exchanges, this proceeding was the product of coordination between the Town and the Thorntons singling out Plaintiff for disparate treatment.

51.     Government bodies are not permitted to collude with private citizens to formulate code enforcement strategies targeting other private citizens.  Nor are government bodies permitted to rely on the advice of "litigators" retained by private citizens in order to assist them in litigation against other citizens or to maximize the injurious impact that code enforcement activities will have on such citizens.

15

52.     Plaintiff's counsel immediately moved for reconsideration and advised the Town that this exact issue was being litigated in Circuit Court between the Thorntons and Plaintiff.  In other words, Plaintiff's counsel advised the Town that the letter and the declaration were the product of orchestrated activities between the Thorntons and the Town to advance the Thorntons' interests in the litigation with Plaintiff.

53.     Despite reconsidering the decision, the Code enforcement proceeding against Plaintiff, predicated on the letter (previewed by the Thorntons' attorney) and the declaration (actually drafted by the Thorntons' attorney) remains pending, with a hearing scheduled for September 17, 2019.

54.     The Code Enforcement Board's failure to dismiss the violation lacks any evidentiary support and is arbitrary and irrational on its face.

### ii.     *The Town Orders Plaintiff to Remove a Shed*

55.     There was a shed located at the 100 Emerald Home that had been there for decades. The shed could not be seen from any public vantage point.

56.     The Town had not taken any adverse action regarding the shed since it was first constructed, which was well before Plaintiff purchased the 100 Emerald Home.

57.     Again, at the direction of the Thorntons, the Town initiated a code enforcement proceeding against Plaintiff ordering Plaintiff to remove the shed or face daily fines.

58.     The code enforcement notice was authored by Mr. Elliott, the same Town official that signed the letter discussed above (which he allowed the Thorntons' attorney to review in advance and revise) and the same Town official that signed the declaration (which the Thorntons' attorney drafted).

**From:** Logan Elliott <LElliott@TownofPalmBeach.com>
**Sent:** Tuesday, July 31, 2018 4:07 PM
**To:** Tim Hanlon <tim.hanlon@amrl.com>; Paul Castro
<PCastro@TownofPalmBeach.com>
**Subject:** RE: 100 Emerald Way

Contacting code enforcement with the pictures and the description of your findings that you provided below. You may want to include these emails from Paul and I which demonstrate that we did not find any evidence of a structure in the NW corner of the property being permitted.

**Logan Elliott**
**Zoning Technician**

Town of Palm Beach
Planning, Zoning, Building
360 S. County Road
Palm Beach, FL 33480
Phone: 561-227-6409
www.townofpalmbeach.com

**From:** Tim Hanlon [mailto:tim.hanlon@amrl.com]
**Sent:** Tuesday, July 31, 2018 3:18 PM
**To:** Logan Elliott <LElliott@TownofPalmBeach.com>; Paul Castro
<PCastro@TownofPalmBeach.com>
**Subject:** RE: 100 Emerald Way

Thanks for investigating Logan.  What is the next step?  Should I contact Code Enforcement or do you want me to send you pictures?

Thanks, Tim

M. Timothy Hanlon
Alley, Maass, Rogers & Lindsay P.A.
340 Royal Poinciana Way, Suite 321
Palm Beach, Florida 33480
Phone: (561) 659-1770
Fax: (561) 833-2261
Direct Fax: (561) 804-4617
tim.hanlon@amrl.com

**From:** Logan Elliott <LElliott@TownofPalmBeach.com>
**Sent:** Tuesday, July 31, 2018 1:50 PM
**To:** Tim Hanlon <tim.hanlon@amrl.com>; Paul Castro
<PCastro@TownofPalmBeach.com>
**Subject:** RE: 100 Emerald Way

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Citigroup Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

Tim,

I looked through the surveys we have on file and do not see any buildings in the NW corner near the driveway entrance. I also do not see any permits going back to 2003 that could have permitted a building there. I have not seen this structure or done a thorough search of our records but it seems the building could be unpermitted.

**Logan Elliott**
**Zoning Technician**

Town of Palm Beach
Planning, Zoning, Building
360 S. County Road
Palm Beach, FL 33480
Phone: 561-227-6409
www.townofpalmbeach.com

Copies of the entire email exchange are attached as Composite **Exhibit 8**.

### iii. *The Town's "Sudden" Change in Position Regarding Parking Permits*

59.     As stated above, because Plaintiff is land-locked behind the other two parcels in the subdivision, Plaintiff has an ingress/egress easement over Emerald Beach Way.

60.     The 100 Emerald Home contains another load-bearing wall—this one in front of the property—with entry gates on the far North side.  This wall was built on the lot line separating Plaintiff's property from the Thorntons' property.  It was done at the request of the Thorntons' predecessor-in-title, who was also Plaintiff's predecessor-in-title that re-platted the subdivision, in order to protect the Thorntons' property from flooding because Plaintiff's property has a higher elevation than the Thorntons' property.  The entry gates were placed on the far North side in order to direct the flow of water to the street (Emerald Beach Way) where the storm sewers are located.

61.     Because of this, Plaintiff is forced to service its property by having service vehicles stop on Emerald Beach Way for short periods of time because they cannot make the 45-degree turn into Plaintiff's property since the entry gates are located on the far North side.

18

62.     For many years, the Town had issued permits to Plaintiff's vendors, such as landscapers, to park on the Cul-De-Sac while servicing the 100 Emerald Home.  The Town's approval was specifically predicated on its own standards, codified in the Town's *Standards Applicable to Public Rights-of-Way and Easements*, published by the Department of Public Works Engineering Division of the Town (the "Manual"), which defines an easement (which Plaintiff holds) as a "right of way."

63.     The Thorntons *previously* sought the Town to intervene to prevent Plaintiff's vendors from parking on the Cul-De-Sac.  The Town *previously* refused to do so.

64.     The Town's then Deputy Town Manager (Thomas Bradford), who later became the Town Manager, stated six years ago, in a 2013 e-mail to the Thorntons, that: "If you feel that there should be no parking on the ingress/egress easement, it is not for the Town to enforce.  It is a civil matter between your client and the other neighbors."

65.     But after colluding with the Thorntons in 2018, the Town has now stopped issuing parking permits to Plaintiff's vendors and has instead started issuing *tickets* to Plaintiff's vendors.

    **iv.     *Bobbie Lindsay's Improper Influence Over Town Council to Protect the Thorntons' Unpermitted Tennis Court Complex and Parking Lot***

66.     On May 24, 2017, Margaret Thornton filed an application to build a tennis court complex and a 10-car supplemental parking facility to service their estate next door (the "Application").  As stated above, this is not a normal tennis court or parking facility.  It is a tennis court complex, comprising the entirety of the lot, and including one fully-constructed tennis court, a referee chair, a lounge tennis canopy area, a grass area intended for a second tennis court (but now housing a soccer goal post), and a 10-car commercial parking lot for commercial trucks and other service vehicles that maintain the Thorntons' estate next door.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Citigroup Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

67.     At the time that Margaret Thornton filed the Application, the Town should have required two special exceptions pursuant to the Town's Code: one to build the tennis complex and another to build the parking facility.  The Town's Planning, Zoning & Building Department made the improper determination that a special exception was not needed.  And Plaintiff was not notified of the Planning, Zoning & Building Department's decision not to require the special exceptions. Plaintiff was thus unable to immediately appeal this decision, about which it was not notified.

68.     Instead, Plaintiff received notice of the hearing before the Architectural Commission of the Town of Palm Beach ("ARCOM") to approve the Application.

69.     If the Planning, Zoning & Building Department had required Margaret Thornton to apply for a special exception for the tennis complex and a special exception for the parking facility (as it should have done), then that decision would have been made by the Town of Palm Beach Town Council at a public hearing at which Plaintiff would have had the ability to participate. Because the Planning, Zoning & Building Department allowed Margaret Thornton to by-pass this step, the Application was permitted to proceed directly to ARCOM for approval, of which Plaintiff did receive notice.

70.     On June 27, 2017, Plaintiff submitted a letter of objection to ARCOM.

71.     On June 28, 2017, ARCOM held a hearing on the Application, at the conclusion of which ARCOM unanimously approved the Application over Plaintiff's objections.

72.     On July 7, 2017, Plaintiff appealed ARCOM's decision to grant the Application to the Town Council pursuant to the Town's administrative procedures.  The Town Council held a hearing on August 9, 2017.  The Town Council denied the appeal.  Even though the Town Council is composed of 5 members, the appeal was denied by a vote of 4-0 because Ms. Lindsay, as stated above, recused herself.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Citigroup Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

73.     Thereafter, on September 15, 2017, Plaintiff filed a Petition for Issuance of Writ of Certiorari in the matter styled *100 Emerald Beach Way, LC v. Palm Beach Town Council and Margaret B. Thornton,* Palm Beach County Case No. 502017CA010274XXXXMB, Fifteenth Judicial Circuit (Civil Appellate Division), seeking that the trial court (in its appellate capacity) quash the August 16, 2017 decision of the Town Council denying Plaintiff's Appeal and reversing ARCOM's June 28, 2017 approval.

74.     Despite the appeal, Margaret Thornton constructed the tennis court complex and parking lot anyway.

75.     Plaintiff won the appeal. The trial court (in its appellate capacity) reversed the Town Council and quashed the decision of the Town Council.  On November 5, 2018, after denying motions for rehearing filed by the Town and the Thorntons, the trial court issued its Mandate.

76.     After the trial court issued its Mandate, the Thorntons, as required by the Town Code, filed an application for a special exception for the tennis complex and the parking lot. Indeed, on November 7, 2018, the Town of Palm Beach's Planning Administrator, John Lindgren, advised Margaret Thornton's representative, Dustin Mizell, that:

> Because the court overruled [Town Council's] and ARCOM's approval of the project, *you will need to submit everything all over again and get the necessary zoning and ARCOM approvals for the project*. This includes the proper notice to the surrounding property owners, new fees and *new zoning and ARCOM numbers*. You will need to coordinate with Logan [Elliott] to get a zoning number, and then get an ARCOM number from Kelly.

Copies of these emails are attached as **Composite Exhibit 9** (emphasis added).

77.     On November 8, 2018, Planning Administrator John Lindgren sent a *second* email to Margaret Thornton's representative, stating: "*Paul [Castro] said there was a zoning application for the tennis courts (it was a special exception)*. If this is the case, you will need to coordinate

21

with Paul [Castro] and Logan [Elliott] to have this application return to Town Council for approval prior to going to ARCOM." *See* **Composite Exhibit 9** (emphasis added).

78.     On November 8, 2018, Mr. Lindgren sent a ***third*** email to Margaret Thornton's representative explaining why the special exception was needed: "Dustin, You would have had to have gotten a special exception for the tennis courts, because the code requires it (see below)" and then went on to quote Section 134-1759 of the Town Code, which provides that the "construction of any tennis court . . . shall be subject to an application for a special exception." *See* **Composite Exhibit 9** (emphasis added).

79.     Internally, on November 8, 2018 (after consultation with the Town's attorney, John "Skip" Randolph), Paul Castro (the Town's Zoning Administrator) sent an email to his supervisor, Josh Martin, the Director of the Town's Planning, Zoning & Building Department ***confirming in writing that a special exception was in fact required***.  The email is clear and unambiguous.  Josh Martin asked: "Paul/Logan: Did you guys resolve this matter with Skip today?"  Paul Castro's responded: "Yes, they will need a special exception as well. I can brief you tomorrow." *See* **Composite Exhibit 9** (emphasis added).

80.     But then, the Town of Palm Beach abruptly *reversed* its position—memorialized on ***four*** separate occasions—and all-of-a-sudden decided that a special exception was not needed and that the Thorntons could once again go directly to ARCOM for approval ***without filing a new application***.  This sudden change in the Town's position was critical to the Thorntons, as the Application would have otherwise been denied because of a change in the law between the first hearing and the second hearing.  This is why, as demonstrated above, Timothy Hanlon (the Thorntons' counsel) asked the Town to amend the law to moot out Plaintiff's second appeal.

81.     The only reason that Plaintiff was made aware of this reversal was because the Thorntons had to give notice of the withdrawal of their application.  Otherwise, Plaintiff would have been left without notice—for a second time—of the Town's reversal of its decision.

82.     Plaintiff appealed the decision to the Town Council.  The hearing occurred on March 19, 2019.  This was the second hearing concerning the same issue (the tennis court complex and the parking lot) and the same parties (the Thorntons and Plaintiff), but this time, Ms. Lindsay did *not* recuse herself.  Nor did she ever disclose the *ex-parte* conversation that she had with Margaret Thorntons' lawyer (William Atterbury) that precluded her from participating at the first hearing concerning the same issue and the same parties.

83.     Ms. Lindsay even remembered the first appeal—but did not mention that she recused herself and, again, did not recuse herself the second time: "***So, in 2017, I was here for that appeal, and I remember it.***"  *See* **Exhibit 4**, 58:9-10).

84.     Incredibly, Ms. Lindsay then proceeded to advocate for the Thorntons by trying to convince the other Town Council members that Plaintiff's appeal was time-barred and that Margaret Thornton need not need file a new application (which would have resulted in the Application being denied, because of a change in the law between the first hearing and the second hearing). Specifically, Ms. Lindsay stated as follows:

- "Okay, so, if we were to do what was instructed when they went back, we would just look back at these laws in 2017 and say no special exception was required for the parking; is that right?  And that they should have appealed back then." (**Exhibit 4**, 59:7-13).

- "But we issued the permit under the old law, right?  We issued the permit under the old law." (**Exhibit 4**, 59:22-24).

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Citigroup Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

- "I'm just trying to determine … was their appeal timely … and I'm not seeking that it was." (**Exhibit 4**, 60:21-23).

- "I still go back to the applicant. You know, we're penalizing the application for a staff error, and that bothers me, that I don't -- I mean, I don't know -- I'm still unsure about the legal position, but I don't feel that it's appropriate for town council to penalize an applicant who did everything that they were supposed to do, and then a young staff member made an error. For a short period of time, his boss agreed with him and then realized it was wrong, filed that correction, and now -- you know, now the neighbor is using that situation to try to get them to have to start over as far as I can tell. Is that right? Would that be a correct summary?" (**Exhibit 4**, 84:13 – 85:1).

85.     But the Thorntons did *not* do "everything they were supposed to do." They built the tennis court complex and parking lot during the pendency of Plaintiff's appeal and then used the fact that they took the risk and built the complex during the appeal to somehow argue prejudice if they had to remove it.

86.     Curiously, prior to hearing Plaintiff's appeal, the Town Council members did not call for disclosures of *ex-parte* communications. Every other item on the Town Council agenda that day required the disclosure of *ex-parte* communications.

87.     Improperly (but not surprisingly), the Town Council denied Plaintiff's appeal and the Application went forward to ARCOM for a second time on March 27, 2019.

88.     At the March 27, 2019 hearing, the members of the ARCOM board were visibly annoyed and irritated that they had to hear the Application for a second time. Several members of the ARCOM Board stated that they had already approved the Application and should not have to

waste their time hearing it again.  The Town's foregone conclusion that the tennis court complex and parking lot were already approved disregards Plaintiff's appellate rights and the trial court's Mandate that quashed the prior approval.  Not surprisingly, given the Thorntons' collusion with the Town, ARCOM approved the Application.

**D.     The Town's Blind Eye toward the Thorntons' Code Violations**

89.     The Thorntons have engaged in various conduct in blatant violation of the Code, but the Town refuses to enforce the Code equally against the Thorntons.

**i.     *The Thorntons' Unpermitted Tennis Complex***

90.     To this day, the tennis court complex and parking lot remains unlawfully constructed on Lot 2 *without approval and permits* as required under the Code.

91.     Although the Town ordered Plaintiff to remove allegedly unpermitted structures (the load-bearing wall and the shed), the Town refuses to order the Thorntons to remove the unpermitted tennis court complex and parking lot that the Circuit Court has determined violates the Town Code.

92.     As a result, on November 20, 2018, Plaintiff filed a Complaint against the Thorntons and the Town for declaratory and injunctive relief requesting that the unpermitted tennis court complex be removed in the case styled *100 Emerald Beach Way, LC v. John Thornton, et al.* Palm Beach County Case No. 502018CA014720XXXXMB, Fifteenth Judicial Circuit.

93.     The Town of Palm Beach actually moved to stay the action to give the Thorntons time to obtain after-the-fact approvals and permits, further evincing the Town's unequal treatment of Plaintiff compared to the Thorntons through the discriminatory application of the Code's removal provisions for unpermitted structures.

ii.    *The Thorntons' "No Parking" Signs are Prohibited by the Code*

94.    The Thorntons have installed 12 "No Parking" signs throughout Emerald Beach

Way and around the Cul-De-Sac.  Here is an example of two of the parking signs installed by the

Thorntons, *immediately in front of Plaintiff's property where nobody would ever park*:

 

95.    The "No Parking" signs are *expressly* prohibited by the Town's Code.    Section

134-2410 of the Code provides as follows:

> Tow-away signs shall not be allowed on private property appurtenant to or
> obviously part of a single-family residence. Tow-away signs for two-
> family, townhouse, multi-family, and institutional uses shall only be on
> private property and shall not exceed the minimum size, number and
> location as provided by Florida statute.  In addition, all tow-away signs shall
> be uniform in appearance as approved by the Town's Architectural
> Commission. Tow-away signs on State, County and municipal government
> property shall also meet these requirements. A building permit shall be
> required for a tow-away sign.

96.     All 12 "No Parking" signs are on private property appurtenant to Plaintiff's single-family residence.  Therefore, their placement and their content are both *expressly* prohibited by the Town's Code.

97.     Alternatively, if the signs were to be considered by the Town for approval (they should not be because they are appurtenant to Plaintiff's single-family residence), they would have required prior approval by the Town's Architectural Commission (*i.e.*, ARCOM).

98.     On May 16, 2019, the Town's Code Enforcement Board was supposed to conduct a public hearing on the 12 illegal "No Parking" signs, which Plaintiff was scheduled to attend.

99.     At that hearing, the Town's Code Enforcement Board should have determined that the signs must be taken down because they are illegal, under the express language of the Code.  At the very least, the signs should have been reviewed by ARCOM at a public hearing at which Plaintiff could participate.  In fact, this is the position that the Town took in writing in February 2019.

100.    Neither of these things happened.  Instead, the Town reversed course in favor of the Thorntons once again and allowed the Thorntons to yet again circumvent the proper approval process by allowing the Planning Zoning and Building Director, Joshua Martin, to approve the 12 illegal "no parking" signs through an apparent email exchange dated April 17, 2019 (which has yet to be produced).  This apparently resulted in a permit to the Thorntons for their 12 illegal "no parking" signs on April 23, 2019.  This was again done without notice to Plaintiff.  Plaintiff literally learned about this on May 14, 2019, just two days before the hearing was supposed to occur.

101.    The Town took this action before May 15, 2019 in order to clear the path for the Thorntons so that they can obtain an after-the-fact building permit for their non-conforming tennis complex and parking facility.  Under the Town's Code, the Town cannot issue a building permit

to a property owner if that property owner has outstanding code enforcement violations. Therefore, if the Thorntons' code enforcement violations for their illegal "no parking signs" and illegal "no parking stamps" remained outstanding, they could not obtain the after-the-fact building permits they are seeking for their non-conforming tennis complex and parking facility. By wiping out the Thorntons' code violation for their 12 illegal "no parking" signs on the Cul-de-Sac, the Town was ensuring that the Thorntons' could have a clear path to an after-the-fact building permit for their non-conforming tennis complex and parking facility.

102.    Disturbingly, not only did these Town decisions take place behind closed doors and without notice to Plaintiff, the Town actually concealed them from Plaintiff.

103.    On April 24, 2019, the Town misrepresented to Plaintiff that the hearing on the Thorntons' code violations for their 12 illegal "no parking" signs was still going forward on May 16, 2019, as previously scheduled. In reality, by that time, the Town had *already allowed* the Thorntons to yet again circumvent the proper approval process because the Town's Planning Zoning and Building Director, Joshua Martin, had apparently already approved the illegal "no parking" signs on April 17, 2019 and already issued a building permit to the Thorntons on April 23, 2019.

104.    Again, the Town did not advise Plaintiff until May 14, 2019, almost one month after the approval took place, and only two days before the Code Enforcement hearing was supposed to take place. The reason for the late disclosure and the concealment is self-evident: to thwart Plaintiff's potential appeal of this decision.

105.    The Town has a thirty-day deadline to appeal its written decisions. Plaintiff's online research indicates that the written decision is contained in an email exchange dated April 17, 2019. Curiously, the Town has failed to produce this email exchange to the Plaintiff, even

though it is responsive to Plaintiff's FOIA Request #TC-107-2019.  Plaintiff was forced to file its

appeal on May 14, 2019, within hours' notice.

106.    By canceling the May 16, 2019 Code Enforcement Hearing and circumventing the

ARCOM approval process, the Town, once again, deprived Plaintiff of its due process rights.

### iii.    *The Thorntons' "No Parking" Stamps are Prohibited by the Code*

107.    The Thorntons have also painted 13 "No Parking" stamps on the asphalt throughout

Emerald Beach Way and around the Cul-De-Sac.  They, too, are an eyesore designed to harass

Plaintiff.  And they, too, are prohibited by the Town's Code.

108.    Section 134-2372(12) provides as follows:

> No person shall paint, paste, print or nail any paper sign or any
> advertisement or notice of any kind whatsoever, or cause the same to be
> done, on any curbstone, flagstone or other portion of any sidewalk or street
> or upon any tree, lamppost, hitching post, telephone or telegraph pole,
> hydrant, bridge, workshop or tool shed, or upon any other structure within
> the limits of the town except by resolution of the town council.

109.    Despite this, the Town also refuses to enforce the Code against the Thorntons and

has not ordered the Thorntons to remove the prohibited stamps, despite Plaintiff's request for their

removal.  The Town's position—revealed on May 14, 2019—is that "the letters have been

removed."  But a simple visual inspection of the property demonstrates that the letters have not

been removed; they are now black instead of white:



### iv. *The Town Finds a Way for the Thorntons to Maintain an Illegal Hitting Wall on their Property*

110.   Sometime in 2017, the Thorntons submitted an application to construct a tennis hitting wall on their property.  The construction of a hitting wall also requires a special exception from the Town, as determined by the Town's Planning, Zoning and Building Department.

111.   When they were advised by the Town that construction of a hitting wall requires a special exception from the Town, the Thorntons met with Logan Elliott and convinced him that they were no longer going to build a hitting wall but, instead, it would be a basketball/service area.

112.   Immediately, Logan Elliott agreed that the Thorntons no longer needed a special exception "due to the removal of the hitting wall application."  Copies of these emails are attached as **Composite Exhibit 10**.

113.   All the Town required was that the Thorntons agree to the "special condition" that the wall would not be used as a hitting wall.

114.   In effect, this "special condition" was nothing more than a wink and a nod.  As can be seen plainly from aerial photography taken from the internet, the Thorntons built a hitting wall

and, in fact, even striped a half tennis court on the wall. *See* **Composite Exhibit 10**. The application was for a hitting wall. A special exception was required. They built a hitting wall without a special exception and the Town sanctioned it merely because they agreed to call the "hitting wall" a "basketball/service area."

E. **Collusion to Violate Plaintiff's Right to Due Process in the Town of Palm Beach's Selective-Enforcement Proceeding**

    i. *Additional Factual and Procedural History*

115.    As discussed above, the Thorntons were able to orchestrate the Town initiating a code enforcement proceeding against Plaintiff claiming a load-bearing wall that has existed for 65 years and that has been inspected by the Town on no less than eight occasions somehow now lacks "building permits." (**Exhibit 7**, 2:21-22.)

116.    On March 21, 2019, the Town's Code Enforcement Board conducted a hearing on the purported wall-permit issue at which the Board considered sworn testimony from the Town's officials and argument from Thorntons' counsel and Plaintiff.

117.    Initially, the Board found the wall was noncompliant, taxed hearing costs, and compelled removal of a load bearing wall, including all permits and inspections, by June 17, 2019. (**Exhibit 7**, 84:17-86:5.)

118.    Plaintiff immediately moved for reconsideration, in accordance with the Town Code, because the Board was *seemingly* unaware of the Circuit Court litigation involving Plaintiff and the Thorntons concerning this very issue.[6] (**Exhibit 7**, 92:19-23.)

---

[6]    *See* Roberts Rules of Order, § 36 (providing that motions for reconsideration "be made only on the day the vote to be reconsidered was taken, or on the next succeeding day, a legal holiday or a recess not being counted as a day"); *see also* Section 2-86 of the Town's Code ("In all cases involving points of parliamentary law, Robert's Rules of Order, Newly Revised, the latest edition, shall be the book of reference.").

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Citigroup Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

119.     The Thorntons' counsel vehemently opposed Plaintiff's motion for reconsideration. (**Exhibit 7**, 86:20-109:15.)  But, based upon the pending state court litigation, the Board granted Plaintiff's motion for reconsideration and deferred any further ruling on the issue until September 19, 2019.  (**Exhibit 7**, 107:16-109:1.)

120.     The Thorntons' counsel actually discussed making a motion to reconsider the motion to reconsider, but admitted it was "a joke."  (**Exhibit 7**, 109:5-7.)

121.     In truth, motions to reconsider motions to reconsider are specifically precluded by the Town's Code, but that is exactly what the Town permitted the Thorntons to do, and they permitted them to do it at an *ex parte* hearing of which Plaintiff received *no notice*.

### ii.   *Collusion with the Town's Attorney Regarding Secret Hearing*

122.     On the night of April 17, 2019, Timothy Hanlon (the Thorntons' attorney) apparently called John "Skip" Randolph (the Town's attorney) to inform him that he and Margaret Thornton would be attending the Board's April 18, 2019 hearing to move to reconsider Plaintiff's previously-granted motion to reconsider regarding the wall-permit issue on Plaintiff's property.[7]

123.     Margaret Thornton's motion for reconsideration was ***not***  on the Board's April 18, 2019 agenda, and Plaintiff was ***not***  provided with any notice of the April 18, 2019 hearing, which are both prerequisites under the Town Code before the Board may hear any argument.[8]

---

[7]     Mr. Randolph confessed to having this conversation to Plaintiff's counsel.

[8]     Town Code, § 2-432(d) ("The enforcement board shall proceed to hear the cases on the agenda for that day."); *id.*, § 2-462 ("Written notice of the enforcement board hearing shall be hand delivered or mailed to the violator as provided in section 2-437 within a reasonable time prior to the board hearing.").

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Citigroup Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

124.     Having been the Town's attorney for many years, Mr. Randolph knows the Board may only hear matters on the agenda that have been properly noticed for hearing, but nevertheless apparently acquiesced to the Thorntons' plan.

125.     Disgracefully, neither Mr. Hanlon nor Mr. Randolph notified Plaintiff of Mr. Hanlon's and Mrs. Thornton's intent to argue the motion for reconsideration in a case involving Plaintiff's property rights.  Plaintiff thus had no notice of the hearing.  Plaintiff learned about it when Plaintiff received an order denying the Thorntons' motion for reconsideration.

### iii. *Collusion with Chairman of the Board Regarding Ex Parte Hearing*

126.     It is clear from a simple reading of the transcript that the Chair of the Board, Matthew Natale, was also tipped off to Margaret Thornton's plan. As the April 18 hearing transcript reflects, after Timothy Hanlon's brief introduction—***which make no reference whatsoever to Margaret Thornton's intent to argue a motion for reconsideration***—Chair Natale informed the Board that Margaret Thornton was present "to ask for a motion to reconsider:"

CHAIRMAN NATALE: Next is code statistics.

MR. HANLON: Mr. Chair, ***Mrs. Thornton would like to address the board if you would entertain her questions*** regarding a case that you heard last month, regarding 100 Emerald Beach Way?

CHAIRMAN NATALE: Absolutely. We're going to do code statistics and then see if the Board will allow that to be heard. The code statistics is our routine of getting going –

MR. HANLON: -- sure, sure.

CHAIRMAN NATALE: We haven't launched yet. We'll get to you.

MR. HANLON: Thank you.

(Thereupon, code statistics was announced and the proceedings continued as follows:)

> CHAIRMAN NATALE: Thank you for those statistics. Now as your heard from Mr. Hanlon over there, we had a matter last month, a wall and a permit. We couldn't possibly summarize it briefly here *but one of the parties is here to ask for a motion to reconsider that action* and so I thought it would be best to hear that now before with get with our regular scheduled business, hear it and dispense with it one way or the other. Is there any objection from the Board to hearing this now? Is that fair enough? Okay, I hear no objection. Please, introduce yourself and be sworn and thank you for being here.

(**Exhibit 5**, 2:14-3:16) (emphasis added).

127.    Chair Natale's knowledge of Margaret Thornton's intent to argue a motion for reconsideration—without being told this on the record at the April 18, 2019 hearing—demonstrates that the Chair also had a prior (*i.e.*, *ex parte* communication) regarding the motion for reconsideration.

128.    And, again, before *every* hearing, Chair Natale called for the Board members to disclose any *ex parte* communications they had relating to the matter to be heard.[9]  Chair Natale did *not* follow this standard protocol at the April 18, 2019 hearing, which allowed Margaret Thornton and her counsel to proceed on the *ex parte* motion to reconsider without requiring the Board's members, including Chair Natale, to disclose their *ex parte* communications.

129.    Shamefully, Chair Natale then proceeded to advocate for Margaret Thornton's motion for reconsideration—which was *not* on the agenda and *not* noticed for hearing and as to which Plaintiff had *no* notice and thus did *not* appear—to be heard without Plaintiff, whose property rights are at issue, stating that "it would be best to hear [the motion] now" and it is "fair enough." (**Exhibit 5**, 3:10-14).

---

[9]    For example, *before* the March 21 hearing, Chair Natale stated: "Has there been any *ex-parte* conversations regarding this matter?  Hearing none, please proceed." *See, e.g.*, **Exhibit 5**, 2:9-11.

### iv. *The Town Violates Plaintiff's Right of Due Process and Multiple Provisions of the Town Code by Holding* Ex Parte *Hearing*

130.    As stated above, on April 18, 2019, the Town permitted Margaret Thornton and her attorney to argue the *ex parte* motion for reconsideration that concerned Plaintiff's property rights even though Plaintiff was not provided with any notice and was thus deprived of any opportunity to be defend against the motion.[10]

131.    By doing so, the Town trampled on Plaintiff's fundamental right to due process as well as many provisions of the Town Code.

132.    First, the Town Code expressly states that "fundamental due process shall be observed and govern the proceedings." Town Code, § 2-432(d). The Town violated this provision of its Code because Plaintiff was not given any notice of the hearing on Margaret Thornton's motion and deprived of an opportunity to be heard.

133.    Second, the Town Code only authorizes the Board to hear cases on the agenda. Town Code, § 2-432(d) ("The enforcement board shall proceed to hear the cases on the agenda for that day."). The Town violated this provision of its Code because Margaret Thornton's motion for reconsideration was not on the agenda.

---

[10]    This conduct was also highly unprofessional and unethical for the Thorntons' counsel. *See* Fla. R. Professional Conduct 4-3.5(b)(3) ("a lawyer shall not communicate or cause another to communicate as to the merits of the cause with a judge or an official before whom the proceeding is pending except: ... *orally upon notice to opposing counsel or to the adverse party if not represented by a lawyer*.") (emphasis added); *see also* The Florida Bar, Guidelines for Professional Conduct (ed. 2008), § J (1) "(A lawyer should avoid *ex parte* communication on the substance of a pending case with a judge before whom the case is pending."); *id.*, § J (2) ("Before making an authorized *ex parte* application or communication to the court, *a lawyer should make diligent efforts to notify the opposing party or a lawyer known or likely to represent the opposing party* and to accommodate the schedule of that lawyer to permit the opposing party to be represented on the application.") (emphasis added).

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Citigroup Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

134. Third, the Town Code requires that written notice of a code enforcement hearing be delivered within a reasonable time of the hearing. Town Code, § 2-462 ("Written notice of the enforcement board hearing shall be hand delivered or mailed to the violator as provided in section 2-437 within a reasonable time prior to the board hearing."). The Town violated this provision of its Code because Plaintiff, whose property is at issue, was not provided with any notice of the hearing.

135. Fourth, the Town Code requires that motions for reconsideration "be made only on the day the vote to be reconsidered was taken, or on the next succeeding day." Roberts Rules of Order, § 36; *see also* Town Code, § 2-86. The Town violated this provision of its Code by allowing Margaret Thornton and her counsel to argue an *ex parte* motion for reconsideration nearly a month after the vote at issue was taken. Again, it is worth noting that the Town knew about this in advance. Mr. Randolph later confessed that Mr. Hanlon called him "the night before."

136. Fifth, the Town Code even prohibits a motion to reconsider a motion to reconsider. *See* Roberts Rules of Order, § 36 ("No question can be twice reconsidered unless it was materially amended after its first reconsideration."); *see also* Town Code, § 2-86. The Town violated this provision of its Code by permitting Margaret Thornton and her counsel to argue a prohibited motion.

137. The Town's violation of Plaintiff's fundamental right to due process and willingness to disregard multiple provisions of the Town Code for the Thorntons' benefit further evinces the Town's discriminatory intentions and conduct toward Plaintiff.

v.  *Margaret Thornton's and Timothy Hanlon's Failed Attempt to Deceive the Board*

138.   Margaret Thornton and Timothy Hanlon were both sworn in at the April 18, 2019 hearing.  In other words, they were not just arguing a motion for reconsideration.  They were also providing sworn testimony to the board.

139.   They blatantly attempted to deceive the Board by (i) suggesting that Plaintiff engaged in *ex parte* communications at the prior hearing in connection with Plaintiff's motion for reconsideration, and (ii) claiming Margaret Thornton and her counsel did not have an opportunity to defend against Plaintiff's motion for reconsideration at the prior hearing:

> MR. HANLON: . . . There are some important facts and some legal issues that we wanted to present as part of – that we would have presented had we had the opportunity the last time that we think are important and relevant to your decision to defer and that's why we're back before you today.
>
> ***
>
> MR. HANLON: -- no, clearly one attorney and the Thorntons were in the conference room outside of chambers and one attorney was in his car when that extra conversation took place by Mr. Schneider and the request to overturn the decision. So none of those parties were here during that portion and that's –
>
> ***
>
> MS. THORNTON: . . . I don't know what they testified to so we had no way to respond.

(**Exhibit 5**, 17-18, 10:6-11, 10:13-18; 11:5-11; 12:7-8).

140.   The Town's counsel (Skip Randolph) summarized the basis for Margaret Thornton's *ex parte* motion for reconsideration as follows: "The allegation of Mrs. Thornton is, and of her attorney, is that they were prejudiced because they were out of the room, when this matter was heard and did not have an opportunity to address the merits and the merits related to

the fact that this was under consideration by the court and that you should act on this until the court has acted." (**Exhibit 5**, 14:13-20.)

141.     But Margaret Thornton's and Timothy Hanlon's *sworn statements* at the April 18, 2019 hearing are patently false.  A court reporter attended the March 21, 2019 hearing, and the hearing transcript establishes that the Thorntons' counsel argued vehemently against Plaintiff's motion for reconsideration, and even joked at the end about a motion to reconsider the motion to reconsider. *See* **Exhibit 7**, 86:13-190:15.  It was nothing short of dishonest for Timothy Hanlon and Margaret Thornton to suggest that the Thorntons' counsel was not present to defend against Plaintiff's motion for reconsideration.

142.     The Board allowed Margaret Thornton's *ex parte* motion for reconsideration to proceed to a vote, and two Board members, *including Chair Natale*, voted in favor of it, which is appalling.

143.     Plaintiff again did not learn of the *ex parte* hearing until Plaintiff's counsel was served with the Board's Order four days later.

144.     Simply put, the Town's conduct against Plaintiff is outrageous and deplorable.  Not only is the Town selectively enforcing the Town Code arbitrarily and discriminatory against Plaintiff, in violation of Plaintiff's right to equal protection, but the Town is also violating Plaintiff's right to due process during the Town's selective-enforcement proceeding.  The imposition of punitive damages to discourage the Town from engaging in such reprehensible conduct in the future is clearly warranted.

## COUNT I
## (EQUAL PROTECTION – "CLASS OF ONE")

145.     Plaintiff restates and realleges paragraphs 1 through 144 as if fully set forth herein.

146.     This is an action for damages against the Town, pursuant to 42 U.S.C. § 1983, arising from the Town's selective enforcement of the Code against Plaintiff in violation of Plaintiff's right of Equal Protection guaranteed by the Fourteenth Amendment.

147.     The Equal Protection Clause of the Fourteenth Amendment prohibits the government from discriminating against similarly situated individuals without a rational and neutral basis for doing so.

148.     The Town has engaged in an intentional pattern of singling out Plaintiff for selective enforcement, inequitable treatment and purposeful discrimination through the unequal, unjust and oppressive administration of the Town's Code.

149.     The Town has engaged in an arbitrary and irrational pattern of conduct that treats Plaintiff differently than its similarly-situated neighbor, the Thorntons.

150.     The Town has enforced the Code to require the removal of unpermitted structures unequally against Plaintiff compared to the Thorntons by ordering Plaintiff to remove Plaintiff's beach access wall and shed, which have existed for many decades, but refusing to order the Thorntons to remove the unpermitted Tennis Complex, which a Florida court has already found to be out of compliance with Town's requirements.

151.     The Town has also enforced the Code's other provisions governing the Cul-De-Sac area unequally against Plaintiff compared to its neighbor, the Thorntons, by refusing to issue permits to Plaintiff's vendors and ticketing Plaintiff's vendors for parking on the Cul-De-Sac, while refusing to immediately order the Thorntons to remove their "No Parking" stamps from the Cul-De-Sac (which the Code expressly prohibits), being dilatory in their enforcement of the "No

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Citigroup Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

Parking" sign rules against the Thorntons and refusing to order the removal of the Thorntons' illegal hitting wall.

152.    The Town's decisions to enforce the Code against Plaintiff, while turning a blind eye to the Thorntons' Code violations is arbitrary and discriminatory.

153.    The Town has no rational basis for treating Plaintiff in a disparate fashion as compared to the Thorntons.

154.    The Town's actions and policies, as applied to Plaintiff, violate the Equal Protection Clause of the Fourteenth Amendment.

155.    Plaintiff has been damaged as a direct and proximate result of the Town's discriminatory actions, policies and practices toward Plaintiff.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter a judgment in favor of Plaintiff and against the Town awarding Plaintiff compensatory damages for the Town's violation of Plaintiff's constitutional rights and resulting injury, awarding punitive damages, awarding Plaintiff its attorneys' fees and costs pursuant to 42 U.S.C. § 1988, directing the Town to cease engaging in activities that unlawfully discriminate against Plaintiff, violate its rights to due process, or unequally apply the Code to unfairly benefit the Thorntons, and for such other and further relief as the Court deems just and proper.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Citigroup Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 15th, 2019

LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP
*Counsel For 100 Emerald Beach Way LC*
201 South Biscayne Boulevard
22nd Floor
CITIGROUP CENTER
Miami, Florida 33131
Telephone: 305.403.8788
Facsimile: 305.403.8780

By: /s/ Jeffrey C. Schneider, P.A.
Jeffrey C. Schneider, P.A.
Florida Bar No. 933244
Primary Email:  jcs@lklsg.com
Secondary Email: lv@lklsg.com
Jezabel P. Lima
Florida Bar No. 519431
Primary Email: jl@lklsg.com
Secondary Email: ah@lklsg.com
Matthew J. McGuane
Florida Bar No. 84473
Primary Email: mjm@lklsg.com
Secondary Email: ar@lklsg.com